UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------------------------X
TRACY ELLIS,

                                                        Plaintiff,                         Civil Action No.

       -against-                                                 **COMPLAINT**

WELLS FARGO BANK, NATIONAL ASSOCIATION;     Plaintiff Demands a Trial by Jury
WELLS FARGO CORPORATION; and
JOSEPH MACKIE, *individually.*

                                              Defendants.
------------------------------------------------------------------------------X

Plaintiff, TRACY ELLIS, as and for her Complaint against Defendants respectfully alleges upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.* ("ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et. seq.* ("PHRA"), and the Philadelphia Fair Practices Ordinance, § 9-1100 *et. seq.* ("PFPO"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of her disabilities, discriminated against on account of her association with her disabled son, and retaliated against by her employer for reporting such discrimination and for exercising her rights to leave under the FMLA.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is conferred upon this court as this action involves a Federal Question under the Americans with Disabilities Act of 1990 and the Family and Medical Leave Act of 1993. The Court also has supplemental jurisdiction over the State and City Causes of Action.

3. Venue is proper in this district based upon Defendants' place of business within the County of Philadelphia, in the Commonwealth of Pennsylvania, within the Eastern District of Pennsylvania. Additionally, the events at issue took place within the County of Philadelphia, in the Commonwealth of Pennsylvania within the Eastern District of Pennsylvania.

4. On or around June 7, 2016, Plaintiff TRACY ELLIS filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") against Defendants as set forth herein.

5. On or around January 27, 2017, the EEOC issued Plaintiff a Right to Sue Letter.

6. This action is being commenced within ninety (90) days of Plaintiff's receipt of the EEOC Right to Sue Letter.

## PARTIES

7. At all times material, Plaintiff TRACY ELLIS (hereinafter "Plaintiff" or "ELLIS") was and is an individual female who did and continues to reside in the County of Delaware, within the Commonwealth of Pennsylvania.

8. At all times material, Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION was and is a foreign business corporation authorized to do business in the Commonwealth of Pennsylvania.

9. At all times material, Defendant WELLS FARGO CORPORATION was and is a foreign business corporation authorized to do business in the Commonwealth of Pennsylvania.

10. At all times material, Defendants WELLS FARGO BANK, NATIONAL ASSOCIATION and WELLS FARGO CORPORATION operated and continue to operate a banking branch office located at 2005 Market Street, Suite 150, Philadelphia, PA 19103 (hereinafter "the Market Street branch").

11. At all times material, Defendants WELLS FARGO BANK, NATIONAL ASSOCIATION and WELLS FARGO CORPORATION (hereinafter collectively "Defendants") jointly employed Plaintiff at the Market Street branch.

12. At all times material, Plaintiff was employed as a Personal Banker II with Defendants.

13. At all times material, Defendant JOSEPH MACKIE (hereinafter "MACKIE" or "Defendant MACKIE") was employed by Defendants at the Market Street Branch.

14. At all times material, Defendant MACKIE was employed as a Branch Manager of the Market Street branch.

15. At all times material, Defendant MACKIE had direct supervisory authority over Plaintiff.

## MATERIAL FACTS

16. On or around December 17, 2013, Defendants hired Plaintiff as a Personal Banker II.

17. In or around December 2014, Plaintiff applied for and received intermittent FMLA leave to care for her son's disabilities as necessary.

18. In or around July 2015, Defendant MACKIE became the Branch Manager for Defendants' Market Street branch.

19. On or around July 23, 2015, Plaintiff ELLIS was hit by a car while crossing a street, and consequently suffered physical injuries, including but not limited to severe injuries to her left leg and ankle.

20. As Plaintiff's injuries substantially affected her ability to perform major life activities such as walking, standing, and sitting, Plaintiff consequently suffered from temporary disabilities.

21. Accordingly, Plaintiff was unable to work from approximately July 23, 2015, to August 17, 2015, and was placed on Short-Term Disability ("STD") leave by Defendants.

22. Plaintiff also applied for and received intermittent FMLA leave following this accident, which allowed Plaintiff to work a limited schedule for part of the workday and have the rest of the day considered as FMLA leave (once Plaintiff returned from her STD leave).

23. Plaintiff was approved for intermittent FMLA leave for her own disabilities from approximately July through December of 2015.

24. When Plaintiff was able to return to work, Plaintiff's physician restricted her to working no more than 4 to 5 hours per day and from performing certain job duties, including but not limited to sitting or standing for prolonged periods of time. Plaintiff's physician also required Plaintiff to keep her left foot elevated whenever possible.

25. On or around August 19, 2015, just two (2) days after she was cleared to return to work, Plaintiff was absent from work for a scheduled doctor's appointment.

26. Upon Plaintiff's return to work on or around August 20, Defendant MACKIE accused Plaintiff of "not being focused on her [Plaintiff's] work" and of knowing that she (Plaintiff) would not be working on August 19 because she had not scheduled any appointments for that day.

27. Additionally, MACKIE berated Plaintiff for not being able to stay at work beyond the required approximate four (4) hours Plaintiff's doctor had recommended because of her disability.   At the time, Plaintiff was on her own intermittent leave pursuant to FMLA.

28. Defendant MACKIE then placed Plaintiff on a Performance Improvement Plan ("PIP"), despite Plaintiff having been off work for the month immediately prior.

29. Around the same time, Plaintiff also informed MACKIE of her disabilities and related work restrictions, such as needing to keep her foot elevated and working a limited schedule.

30. Despite Plaintiff's attempt to engage in the interactive process regarding her disabilities, MACKIE ignored Plaintiff's attempts to contact him and refused to acknowledge her attempts.

31. On or around August 21, 2015, during a Branch Meeting for the Market Street branch, Defendant MACKIE informed Defendants' employees that the Market Street branch employees' job duties would be assigned to specific employees going forward. Defendant MACKIE further stated that Plaintiff would handle all Business Customers, Plaintiff's co-worker Shakeia Nelson ("NELSON") would handle all Investment Customers, and Plaintiff's co-worker Jason Hewitt ("HEWITT") would handle all the "Wells at Work" customers.

32. Despite Defendant MACKIE's statement, Defendant MACKIE deliberately directed Defendants' Business Customers to NELSON instead of Plaintiff, thereby preventing Plaintiff from meeting her required quotas and goals (including, but not limited to opening new credit accounts, meeting with customers, and processing loans).

33. On or around August 28, 2015, Defendant MACKIE informed Plaintiff that Plaintiff needed to arrive at work by 8:15 AM.   However, Defendant MACKIE did not require any of Plaintiff's co-workers to arrive at 8:15 AM.

34. On or around September 23, 2015, Defendants issued Plaintiff an informal warning stating that Plaintiff did not properly dispose of customer information.

35. On information and belief, Plaintiff consistently properly disposed of customer information.

36. On or around September 28, 2015, Plaintiff formally reported in writing to Defendants' Human Resources department that she was being discriminated against and retaliated against on account of her disabilities and usage of FMLA leave.

37. On information and belief, Defendants failed to meaningfully investigate Plaintiff's complaint.

38. On or around October 9, 2015, a mere eleven (11) days after reporting the discrimination and retaliation occurring at the Market Street branch, Defendants issued Plaintiff a "Final Notice of Workplace Conduct" alleging that Plaintiff had been rude to a customer who had called the Market Street branch on or around October 7, and that the customer had reached out to Defendant MACKIE to complain about Plaintiff.

39. Despite the "Final" title of the notice, Plaintiff had not received any prior warnings or counseling alleging that she had been rude to a client.

40. In fact, on or around the preceding Tuesday (approximately October 7) upon seeing the email from MACKIE about the supposed "customer complaint" that the notice referenced, Plaintiff immediately spoke with the customer who had supposedly complained about Plaintiff.   During this conversation, the customer stated to Plaintiff in words or

substance that Defendant MACKIE had been the one to reach out to the customer in the first place, that Defendant MACKIE had manipulated her statements, and that she had not, in fact, complained about Plaintiff.  When Plaintiff addressed this issue with Defendant MACKIE, he admitted that he had lied about the customer calling to complain about Plaintiff.

41. Following her receipt of the "Final Notice", Plaintiff immediately reported Defendant MACKIE's dishonest and retaliatory behavior to Human Resources, and explicitly stated that she was being retaliated against for her earlier complaint.

42. Once again, Respondents took no meaningful actions to investigate Plaintiff's report.

43. On or around February 23, 2016, Defendant MACKIE sent a text message to Defendants' Teller Service Manager Beverly Miller ("MILLER") stating in words or substance that he wanted MILLER to document everything that Plaintiff did at work and to email him if she did anything out of compliance.

44. Defendant MACKIE did not ask MILLER to monitor any of Plaintiff's co-workers during this time who had not taken disability or FMLA leave.

45. On or around February 28, 2016, Plaintiff filed an additional report with Human Resources regarding Defendants' continued acts of retaliation against her.

46. Once again, Defendants failed to take any meaningful action to address or rectify Plaintiff's complaint.

47. On or around February 29, 2016, only one (1) day after filing her additional complaint with Human Resources, Defendant MACKIE met with Plaintiff and stated to her in words or substance that he would "continue to document [Plaintiff] until he [MACKIE]

gets her out"; that "[Plaintiff's] time and attendance were an issue"; that "FMLA won't help [Plaintiff]" and that "[Plaintiff] can call HR [and] they won't do anything."

48. During that same conversation, Defendant MACKIE stated to Plaintiff that he was removing Plaintiff's responsibilities as the Market Street branch's Business Specialist.

49. Immediately following this conversation, Plaintiff once again reported Defendant MACKIE's retaliatory conduct to Human Resources.

50. Once again, Defendants failed to take any meaningful action to rectify the situation.

51. On or around March 14, 2016, Defendant MACKIE canceled one of Plaintiff's scheduled paid time off.   According to Plaintiff's co-worker, MACKIE did so because he "didn't approve it."

52. Defendant MACKIE regularly denied Plaintiff's requests to utilize Paid Time Off ("PTO") in retaliation for Plaintiff's utilization of her approved intermittent leave under FMLA.   Defendant MACKIE also denied Plaintiff the use of her intermittent leave under FMLA on March 30, 2016.

53. On or around March 23, 2016, Respondents' Human Resources department finally contacted Plaintiff about her numerous reports regarding the discrimination and retaliation that Plaintiff had suffered.   When Eddie Andrews ("ANDREWS") (one of Respondents' Human Resources Consultants) emailed Plaintiff, he stated that there was no record of Plaintiff's initial complaint, despite the fact that the complaint had been properly filed with the Human Resources department.

54. On or around April 12, 2016, Plaintiff contacted ANDREWS to inform him that Defendant MACKIE was continuing to retaliate against her as a result of her complaints.

55. In response, ANDREWS sent Plaintiff a dismissive and condescending email that advised Plaintiff to "do as directed by your manager [MACKIE]" and "take Joe [MACKIE] up on his offer to help you meet your goals which, as you informed me today, are not where they should be."

56. ANDREWS' email clearly demonstrated that Defendants did not take Plaintiff's reports seriously.

57. On or around April 22, 2016, ANDREWS stated to Plaintiff in words or substance that MACKIE "had done nothing wrong" and that he was dismissing Plaintiff's complaint.

58. On or around May 5, 2016, Respondent issued Plaintiff three disciplinary actions: an informal warning for punctuality, a Final Notice for Workplace Conduct (regarding an alleged incident with a customer on or around February 25), and another PIP.

59. Additionally, around November 2016, Defendant MACKIE began sending Plaintiff emails alleging that Plaintiff was not properly performing her work on various customer accounts.

60. Following this latest untrue allegation, Plaintiff once again reported the ongoing retaliation to Human Resources.

61. In response to her complaint, Respondents failed to properly acknowledge or investigate Plaintiff's report, and instead, Bridget Hotchkiss, Defendants' human resource representative told her on one occasion in words or substance to "mind [Plaintiff's] own business and pay attention to your work" when she requested an update.

62. Once again, Respondents demonstrated a clear disregard for Plaintiff's legitimate reports of discrimination and retaliation.

63. In or around December 2016, Defendant MACKIE told Plaintiff that they were moving her desk and placing another worker, named Shakiea into Plaintiff's work space.

64. In or around March 2017, Plaintiff qualified to receive her Series 6 and Series 63 securities licenses and completed training to perform "Medallion Signature Guarantees" for Defendants.

65. The Series 6 and Series 63 securities licenses would have duly qualified Plaintiff for an increase in income.

66. Despite Plaintiff's training and qualifications, MACKIE refused to discuss the licensing with Plaintiff, thereby preventing Plaintiff from receiving additional income and responsibilities.

67. Around the same time, MACKIE allowed Plaintiff's co-worker HEWITT to receive the same licenses.

68. MACKIE's refusal to allow Plaintiff the same opportunities for advancement with Defendants that similarly situated co-workers received constituted further retaliation for Plaintiff's complaints.

69. On or around March 20, 2017, Defendants sent Plaintiff an email.   In words and substance the email requested that Plaintiff consider relocating to another bank branch. Plaintiff was the only employee at her branch who was requested to relocate.

70. Plaintiff was not interested in relocating as it would cause her a hardship in traveling to work.   Currently, Plaintiff is able to take the train directly to the branch where she is employed.   Now, Plaintiff would have to drive since the two possible branch destinations were Germantown or Adams Avenue.

71. Again Defendants singled Plaintiff out and put pressure on her to relocate to another branch in retaliation for Plaintiff's ongoing complaints of discrimination and harassment.

72. As a result of Defendants' conduct, Plaintiff was caused to sustain serious and permanent psychological injuries.

73. Plaintiff suffers from regular panic attacks and nightmares relating to Defendants' conduct. Plaintiff has difficulty sleeping and eating.

74. As a result of Defendants' actions, Plaintiff has been caused to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

75. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

76. As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdictional limit of all lower courts.

77. Defendants' conduct has been malicious, willful and/or outrageous, and conducted with full knowledge of and reckless indifference of the law. As such, Plaintiff demands punitive damages against all Defendants, jointly and severally.

78. The above are just some of the examples of discrimination and retaliation to which Defendants subjected Plaintiff.

79. Defendants have established a pattern and practice of not only discrimination, but also retaliation.

**AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION
UNDER THE AMERICANS WITH DISABILITIES ACT
(Not Against Individual Defendants)**

80. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

81. Title 42 of the Americans with Disabilities Act of 1990 (Pub. L. 101-336), Chapter 126, Subchapter I, § 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

82. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff ELLIS because of her and her son's disabilities.

83. As such, Plaintiff ELLIS has been damaged as set forth herein.

**AS A SECOND CAUSE OF ACTION FOR RETALIATION
UNDER THE AMERICANS WITH DISABILITIES ACT
(Not Against Individual Defendants)**

84. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

85. Title 42 of the Americans with Disabilities Act of 1990 (Pub. L. 101-336), Chapter 126, Subchapter IV, § 12203, states: "(a) Retaliation: No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

86. Defendants engaged in an unlawful discriminatory practice by discriminating against and retaliating against Plaintiff ELLIS because of Plaintiff ELLIS' opposition to Defendants' unlawful employment practices.

87. As such, Plaintiff ELLIS has been damaged as set forth herein.

**AS A THIRD CAUSE OF ACTION**
**FOR RETALIATION AND INTERFERENCE**
**UNDER THE FAMILY AND MEDICAL LEAVE ACT**

88. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

89. Title 29 of the Family and Medical Leave Act of 1993, Chapter 28, Subchapter I, § 2615 states as follows: "Prohibited Acts: (a) Interference with Rights (1) Exercise of Rights: It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise and right provided under this subchapter. (2) Discrimination: It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

90. Defendants interfered with Plaintiff ELLIS' rights under the above section and discriminated against Plaintiff ELLIS for opposing Defendants' unlawful employment practice and exercising her rights.

**AS A FOURTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER STATE LAW**

91. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

92. The Pennsylvania Human Relations Act ("PHRA") § 955 provides that it shall be an unlawful employment practice: "(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or

disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges or employment   or contract, if the individual or independent contractor is the best able and most competent to perform the services required."

93. Defendants engaged in unlawful employment practices prohibited by PHRA § 955 *et seq*., by discriminating against Plaintiff ELLIS because of her disabilities.

94. Plaintiff ELLIS hereby makes a claim against Defendants under all the applicable paragraphs of PHRA § 955.

## AS A FIFTH CAUSE OF ACTION<br>FOR RETALIATION UNDER STATE LAW

95. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

96. The PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: "For any person, employer, employment agency, or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation , proceeding, or hearing under this act."

97. Defendants engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against Plaintiff ELLIS because of Plaintiff ELLIS' opposition to Defendants' unlawful employment practices.

## AS A SIXTH CAUSE OF ACTION
## FOR AIDING AND ABETTING UNDER STATE LAW

98. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

99. The PHRA § 955(e) provides that it shall be an unlawful employment practice "For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

100. Defendants engaged in an unlawful discriminatory practice in violation of PHRA § 955(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

## AS A SEVENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE PHILADELPHIA
## CITY ADMINISTRATIVE ORDINANCE

101. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

102. The Philadelphia Fair Practices Ordinance § 9-1103(1) provides that "It shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her race, ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status, including, but not limited to, the following: (a) For any employer to refuse to hire, discharge, or otherwise discriminate